Walter KIMBREW, Plaintiff,

v.

**EVANSVILLE POLICE DEPARTMENT,** Officers A. Yeager (1055), J. Evans (1089), D. Erk (1040), Defendants.

No. EV 91–167–C.

United States District Court, S.D. Indiana, Evansville Division.

Sept. 30, 1994.

Walter Kimbrew, Pendleton, IN, R. Lawrence Daly, Wright Evans & Daly, Evansville, IN, for Walter Kimbrew.

Stephen H. Thomas, Statham Johnson & McCray, Evansville, IN, for Evansville Police Dept., Officer A. Yeager (1055), Officer J. Evans (1089), Officer D. Erk (1040).

## MEMORANDUM

BROOKS, District Judge.

This matter came before the Court on a trial without a jury, commencing on July 5, 1994. Having considered the evidence, including all exhibits and depositions admitted into evidence, and having considered the demeanor and credibility of the witnesses, the Court hereby enters its findings of fact and conclusions of law in this memorandum.

### Findings of Fact

These findings of fact are developed from evidence that was presented at trial including testimony and exhibits admitted into evidence. This statement is not intended to represent a complete factual determination of this case; further, additional facts will be applied as necessary in the legal analysis below.

Walter Kimbrew and two other individuals were standing in a group between Sycamore Street and Sycamore Park in Evansville, Indiana on the afternoon of November 12, 1989. Prior to this date, Evansville Police Officers Donald Erk, Jr. and Alan Yeager had been advised, directly or indirectly, of the suspicion of illegal drug-related activity being conducted at or near Sycamore Park. While on patrol on November 12, 1989, Officers Erk and Yeager were driving up Sycamore Street towards Sycamore Park when they observed Walter Kimbrew and the other individuals. Officers Erk and Yeager elected to act on the general suspicion of the area and approached the individuals under the guise of questioning them about a suspect in an unrelated matter. While approaching, the Officers saw one of the individuals toss something to the ground which they immediately suspected to be marijuana. Officers Erk and Yeager immediately requested the three individuals to place their hands on the car in an effort to gain control of the situation.

At some point during the confrontation Officers Erk and Yeager had requested backup, such help arrived in the form of Officers John Evans and Stephen Green. Upon arrival, Officer Evans was instructed to pat down "the one on the end," who in this case happened to be Walter Kimbrew. Aware of the nature of the transaction and otherwise suspecting one of the individuals may have a weapon, Officer Evans conducted a frisk for weapons on Walter Kimbrew. Feeling items contained in Walter Kimbrew's front pockets but unsure of their identity, Officer Evans reached his hands into Walter Kimbrew's front pockets and emptied the contents onto the hood of the police car. Upon observation Officer Evans found the contents to include two small clear plastic baggies containing a white powdery substance. One of the bag-

gies was hidden from immediate view in a cellophane cigarette package. Walter Kimbrew insisted the substance was, in fact, baking soda.

Suspecting the white powdery substance to be cocaine or other controlled substance, Officer Evans requested that the substance be field tested. At some point between Sycamore Park and booking at Vanderburgh County Jail in Vanderburgh County, Indiana, the white powdery substance found in Walter Kimbrew's possession field tested positive as containing a controlled substance. Walter Kimbrew was then arrested for possession of a controlled substance and detained in Vanderburgh County Jail for the same. An independent judicial determination of probable cause of Walter Kimbrew's November 12, 1989 arrest was made in Vanderburgh Superior Court, Misdemeanor Traffic Division, on November 13, 1989.

Pursuant to established procedure, the white powdery substance was placed in the evidence drop box at the Evansville Police Department later in the day of November 12, 1989. Frank Wilkins, Evansville Police Department Evidence Custodian, retrieved the white powdery substance from the evidence drop box on November 13, 1989. On November 28, 1989, Frank Wilkins transported the evidence from the Evansville Police Department headquarters located in downtown Evansville to the Indiana State Police Laboratory located approximately seventeen miles away. Testing commenced on the substance December 1, 1989. On December 4, 1989, the completed testing yielded a result indicating the suspected substance was free from any controlled substances. Frank Wilkins then picked up the evidence and associated test results for the return trip to Evansville Police Department headquarters on December 11, 1989. All charges in the matter were dropped and Walter Kimbrew was released from custody January 8, 1990.

### Conclusions of Law

Plaintiff Walter Kimbrew filed a claim in this Court alleging defendants deprived him of constitutionally guaranteed rights in violation of 42 U.S.C. § 1983. This Court has jurisdiction to rule on this matter pursuant to 28 U.S.C. § 1331.

Section 1983 provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State of Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States, or other person, within the jurisdiction thereon, to the deprivation of the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983. Notably, § 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, —— U.S. ——, ——, 114 S.Ct. 807, 811, 127 L.Ed.2d 114, 122 (1994) (internal quotations omitted); *Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985). "When government officials abuse their offices, 'actions for damages may offer the only realistic avenue for vindication of constitutional guarantees.'" *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)). Presently, Plaintiff Walter Kimbrew alleges the Defendants deprived him of rights guaranteed him by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Specifically, Walter Kimbrew claims his Fourth Amendment rights were contravened by an unauthorized search and seizure; Walter further contends his rights to due process were violated by an unreasonable term of incarceration without cause.

### Search and Seizure

The threshold determination for any § 1983 action is whether there has indeed been a constitutional deprivation. *See Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir.1990). Addressing first the alleged Fourth Amendment violation, it is this Court's reading of the current state of Fourth Amendment jurisprudence that the

initial stop and frisk were proper but the subsequent search and seizure were not.

The Fourth Amendment, made applicable to the States by way of the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), serves to guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ..." U.S. Const. amend. IV. While "[n]o right is held more sacred, or is more carefully guarded," *Union Pacific Railway Company v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891), the Supreme Court has stressed that "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). The searches and seizures prohibited are those " 'conducted outside the judicial process, without prior approval by judge or magistrate ... subject only to a few specifically established exceptions.' " *Thompson v. Louisiana,* 469 U.S. 17, 19–20, 105 S.Ct. 409, 410, 83 L.Ed.2d 246 (1984) (per curiam) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). One notable exception was recognized in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where the Supreme Court held that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and dangerous; where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries; ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment ...

392 U.S. at 30–31, 88 S.Ct. at 1884–85. Momentary seizures of individuals by law enforcement for the reasons indicated are commonly known as *"Terry* stops." *See Michi-gan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *United States v. Adebayo,* 985 F.2d 1333 (7th Cir.1993). *Terry* has been applied to make lawful under the Fourth Amendment "a semi-arrest ... if but only if the officers had a 'reasonable suspicion supported by articulable facts' that the persons stopped were engaged in criminal activity." *United States v. Ornelas–Ledesma,* 16 F.3d 714, 716 (7th Cir.1994) (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)).

The pat down, or frisk, incident to the *Terry* stop similarly is lawful only if it is "for the protection of [the officer] and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. at 30–31, 88 S.Ct. at 1884–85. More recently the United States Court of Appeals for the Seventh Circuit held that "[t]he only lawful purpose of a search incident to a *Terry* stop is to protect the officers from the danger that the persons they have stopped will reach for a weapon." *United States v. Ornelas–Ledesma,* 16 F.3d at 719 (citing *Minnesota v. Dickerson,* 508 U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993); *Michigan v. Long,* 463 U.S. 1032, 1049–51, 103 S.Ct. 3469, 3480–82, 77 L.Ed.2d 1201 (1983)). The validity of a *Terry* stop and frisk is evaluated under the totality of the circumstances as they occurred to the officer at the time of the stop. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Espinosa–Alvarez,* 839 F.2d 1201, 1206 (7th Cir.1987).

Under the present facts, there existed a reasonable suspicion justifying a *Terry* stop and frisk. Prior to and during the time of the stop the Defendant officers had been advised of drug activity at or near Sycamore Park. The dangerous nature of the drug trade is well known by the law enforcement community and this Court. An uncorroborated tip from an informant cannot by itself furnish probable cause for an arrest or search. *Illinois v. Gates,* 462 U.S. 213, 227, 103 S.Ct. 2317, 2326, 76 L.Ed.2d 527 (1983). That is not important here, however, as Defendant officers testified that while approach-

ing they observed one of the group throw something to the ground which appeared to be marijuana. The Defendant officers testified that they thereafter observed furtive movements and concerned gestures. These factors combine to create the requisite suspicion for a *Terry* stop and frisk. That the individual who tossed the object to the ground was later acquitted has no detrimental effect on the initial stop. The officers, observing "unusual conduct ... lead[ing] them] reasonably to conclude in light of [their] experience that criminal activity may be afoot" were justified in making the initial stop. *Terry*, 392 U.S. at 30–31, 88 S.Ct. at 1884–85.

Regarding the search beyond the initial *Terry* stop and frisk, the recent Supreme Court holding in *Minnesota v. Dickerson*, 508 U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993), is instructive. It is instructive only for the spirit of the reasoning contained therein as while this Court is fully aware a 1993 holding cannot without compelling reason be retroactively binding on Officer Evans, it is highly relevant in this Court's analysis under *Terry*. The point being *Dickerson* is arguably the most liberal reading of *Terry* to date, if Officer Evans could not satisfy *Dickerson* in 1994, he certainly could not satisfy *Terry* and its progeny in 1989.

In *Dickerson* the Supreme Court specifically rejected a so called "plain feel" exception to the warrant requirement where the identity of the concealed object is not immediately apparent. *Id.* The Supreme Court there declined to analogize the "plain view" exception, *See United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985); *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), to validate a search and seizure incident to a lawful *Terry* stop where the investigating officer could only detect "a lump, a small lump, in the front pocket. ... [which he suspected] to be a lump of crack cocaine ..." *Dickerson*, 508 U.S. at ——, 113 S.Ct. at 2133, 124 L.Ed.2d at 341. The lump was later found to be one fifth of one gram of crack cocaine. *Id.* In discussing the analogy, the Supreme Court reaffirmed the "plain view" exception noting that the whole prem-

ise of the exception is that what the police would lawfully observe could not be construed as a search as there could be no expectation of privacy of that which is in "plain view." *Dickerson*, 508 U.S. at ——, ——, 113 S.Ct. at 2136–37, 124 L.Ed.2d at 345 (citing *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983); *Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983)). In *Dickerson*, however, the Court chose to invalidate the search because unlike the "plain view" exception, the "plain feel" in that case required further inquiry into the criminality of the evidence, thus an unlawful search. The Supreme Court held that under a "plain view" exception if the "incriminating character is not immediately apparent" it is not a valid search; therefore, when physical manipulation does not immediately reveal the criminality contained therein, there can be no further lawful investigation under the guise of *Terry*. *Dickerson*, 508 U.S. at ——, ——, 113 S.Ct. at 2136–37, 124 L.Ed.2d at 345–46. The Supreme Court summarized the *Dickerson* holding as follows:

[a]lthough the officer was lawfully in a position to feel the lump in respondent's pocket, because *Terry* entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or by any other exception to the warrant requirement. Because this further search of respondent's pocket was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional.

*Dickerson*, 508 U.S. at ——, 113 S.Ct. at 2139, 124 L.Ed.2d at 348 (citing *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)).

In the present case Walter Kimbrew was patted down and searched by Officer John Evans. In discussing the events surrounding the search, Officer Evans represented to this Court a variety of versions of the circumstances. In an August 3, 1992 affidavit submitted by Defendants, Officer Evans stated

"[t]hat incidental to the search of plaintiff, two small bags of what appeared to be cocaine were found inside plaintiff's pants pockets. One bag was concealed within the wrapping of a pack of Salem 100 cigarettes." (Evans Aff., ¶ 6). In his deposition Officer Evans testified as follows:

I, at that time, observed that there were large clumps in his pockets, which appeared to be items inside his pockets. I, at that time, did a routine pat-down for weapons.

At that time I felt the two large clumps, on in each of his pockets. I did not know what was in the pockets. I felt for my safety and for the officers' safety that I should find out what is in the pockets, that it could be a weapon, and felt in fear for the other officers' safety and my safety if I did not reach in and find out what was in the pockets. I did do that to each pocket. When I did so, I placed two globs, is the best way I can describe them, of items away from Mr. Kimbrew on the vehicle.

I did not see any weapons that appeared to be items that could harm me at that time. As I looked at the items, I picked up each glob, and I was going to hand them back to Mr. Kimbrew. I, at that time, observed a pack of cigarettes. Inside the cellophane wrapper around the cigarettes I observed a baggy corner containing a white, powdery substance....

(Evans Dep. at 5). At trial, Officer Evans generally demonstrated an inability to distinguish between a frisk for weapons and an actual search, consistently referring to a "pat down search." On the first day of trial, when he was called as a witness by the Plaintiff, Officer Evans recalled:

THE COURT: What else was in the pocket [in addition to the baggies]?

JOHN EVANS: Several items, sir, a large clump of items. Exactly what they were, I really can't remember. I just remember a large clump of items.

(Testimony of John Evans, 7/5/94). On the second day of the trial, when called as a witness for the defense, Officer Evans gave the following testimony:

MR. RAIBLEY: When you patted down Walter's front pockets, could you tell what was inside?

JOHN EVANS: No, sir, it felt like several items; I couldn't tell. I had no idea what was in there.

MR. RAIBLEY: In order for you to conclude that Walter Kimbrew was not carrying any weapons in his pockets that day, what would you have to do?

JOHN EVANS: The only way I could tell whether or not that he had any weapons in his pockets was to actually stick my hand in and remove the items and see them physically and make sure that they were not weapons.

MR. RAIBLEY: Now, do you recall specifically all the items that you removed from his pockets?

JOHN EVANS: No, sir, I don't recall the items. I vaguely remember maybe there's an ink pen there, but other than a large glob of items is about basically all I can say.

MR. RAIBLEY: There were several items in his pockets; is that your testimony?

JOHN EVANS: Yes, yes.

MR. RAIBLEY: Did you find any weapons?

JOHN EVANS: Other than, like I say, I vaguely possibly remember an ink pen. Other than that, I don't recall.

MR. RAIBLEY: Have you ever seen an ink pen used as a weapon?

JOHN EVANS: I don't know if I've ever seen one used as a weapon. I know they have been.

(Testimony of John Evans, 7/6/94). Reviewing the statements, the affidavit makes no mention of the circumstances by which Officer Evans felt the necessity to invade Walter Kimbrew's pockets and the deposition testimony indicates Officer Evans emptied Walter Kimbrew's pockets in keeping with an inarticulable suspicion or fear; it was only at the trial phase that Officer Evans was able to find the term "weapon" in justification of his search incident to the stop and frisk. Officer Evans, however, has it backwards: finding something which he might have suspected to be a weapon and having the requisite suspi-

cion prior to the search are two entirely different things. Officer Evans did not articulate to this Court any suspicion of a weapon or any indication of a weapon before the search beyond the reasonable suspicion justifying the pat down.

Officer Evans' fatal flaw derives from his failure to either understand or appreciate the protective standards set forth by *Terry* and its progeny. It appears, however, Officer Evans is aware or has *become* aware of the "weapons only" language of cases like *Ornelas–Ledesma*, 16 F.3d at 719. If an ink pen becomes a weapon for *Terry* considerations of "armed and dangerous," the situation presented here could come to be termed the "ink pen" exception: any search desired could be conducted subsequent to a *Terry* frisk by merely referring to a mythical ink pen. This Court is unwilling to carve so clever an exception.

In Officer Evans' defense, several cases on record support his theory that an ink pen can be a weapon. *See, e.g., State v. Johnson,* 598 So.2d 1152 (La.App.1992); *Tumminia v. Coughlin,* 175 A.D.2d 383, 572 N.Y.S.2d 455 (1991); *People v. Williams,* 175 Mich.App. 312, 433 N.W.2d 356 (1988); *State v. Johnson,* 304 N.C. 680, 285 S.E.2d 792 (1982); *State v. Gilcrist,* 12 Wash.App. 733, 531 P.2d 814 (1975). Apparently, however, only one court has addressed the pen-as-a-weapon issue in the context of a *Terry* stop and frisk. *See Thomas v. State,* 853 S.W.2d 734 (Tex. App.1993). The *Thomas* court held that

> [f]or the purposes of a limited *Terry* search by armed police officers, we hold that a suspicion that a pen or pencil is in a detainee's pocket does not constitute a reasonable suspicion that a weapon is being concealed. Accordingly, we hold the removal of the object, which [the] Officer [ ] thought was a pen or pencil, from appellant's pocket, constituted an illegal search without probable cause.

853 S.W.2d at 736 (internal citations omitted). Obviously this holding presently has no more operative effect than to pique the interests of this Court, but that fact is altogether irrelevant as this Court is of the opinion there never existed such a pen, and even if there were, Officer Evans has not indicated he had the appropriate suspicion to conduct the search subsequent to the pat down. Officer Evans appeared before this Court attempting to represent the only importance in analysis of the search is what he may or may not have found, without regard to suspicions by which he deemed that search necessary. Officer Evans appeared to be completely indifferent to rights that may exist under the Fourth Amendment as articulated by *Terry* and its progeny.

The Seventh Circuit holding in *Brownell v. Figel,* 950 F.2d 1285 (7th Cir.1991), is relevant in this determination. In *Brownell,* where the Seventh Circuit upheld a search subsequent to a *Terry* stop and frisk despite the failure to discover weapons in the search, the Court noted

> [a]t trial, [the arresting] Officer ... testified that he observed two bulges in the front pockets of [the detainee's] leather jacket, and therefore advised [the detainee] that he wanted to conduct a limited patdown for weapons.... [The] Officer then felt each of the bulges ... and determined that each was the approximate size and texture of a small automatic weapon. Only after emptying [the detainee's] pockets was it apparent that the lumps were packets of cocaine. The district court specifically stated it found [the Officer's] testimony about [the] stop and frisk to be fully and completely credible.

*U.S. v. Somers,* 950 F.2d 1279, 1284 (7th Cir.1991) (internal quotations omitted). The holding in *Brownell* is factually distinguishable as Officer Evans did not testify he had the specific suspicion Walter Kimbrew might be concealing automatic weapons, or any weapon for that matter, nor does this Court find Officer Evans' testimony to be fully and completely credible. With specific reference to *Terry v. Ohio* and its recent reaffirmation in *Minnesota v. Dickerson,* "the incriminating character of the object was not immediately apparent to" Officer Evans, thus a further search was unjustified under the current state of Fourth Amendment jurisprudence and that existing at the time of arrest.

*Arrest and Detention*

Pursuant to his arrest on November 12, 1989, Walter Kimbrew was detained in Van-

derburgh County Jail for fifty-eight days before he was eventually released when all charges were dismissed. Walter claims this term of incarceration constituted a deprivation of liberty contravening the due process clause of the Fourteenth Amendment.

■ On November 12, 1989, the arresting officers had probable cause for Walter Kimbrew's arrest. "The police have probable cause to arrest an individual where 'the facts and circumstances within their knowledge and of which they [have] reasonable trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed of was committing an offense.'" *United States v. Goudy*, 792 F.2d 664, 668 (7th Cir.1986) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)), *See also Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "The determination of whether probable cause exists in a given factual situation involves 'the factual, practical considerations of everyday life upon which reasonable, prudent [persons], not legal technicians act.'" *Id.* (quoting *United States v. Watson*, 587 F.2d 365, 368 (7th Cir.1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979)). Perhaps most succinctly, "finding a white powder in a person's possession provides probable cause to arrest that person for possession of cocaine." *Garcia v. City of Chicago, Ill.*, 24 F.3d 966, 970 (7th Cir.1994).

■ Under the present facts, clearly there was probable cause to arrest. However illegally obtained, the arresting officers acquired from Plaintiff's person a white powdery substance resembling cocaine. The field test kit provided to Evansville Police Officers indicated the substance to be an illegal substance. The fact that a more thorough test subsequently determined the substance was not, in fact, illegal cannot retroactively invalidate the probable cause that existed at the time of arrest. *See Baker v. McCollan*, 443 U.S. 137, 145–46, 99 S.Ct. 2689, 2694–95, 61 L.Ed.2d 433 (1979); *Schertz v. Waupaca County*, 875 F.2d 578 (7th Cir.1989).

■ The next issue Walter Kimbrew contests is his fifty-eight day stay in Vander-

burgh County Jail. "The right to arrest a suspect does not, of course, give the state the right to hold him for any length of time or under any conditions. It is axiomatic that due process requires that a pretrial detainee not be punished." *Bergren v. City of Milwaukee*, 811 F.2d 1139, 1143 (7th Cir.1987) (internal quotation omitted). Subsequent to judicial determination of probable cause on November 13, 1989, Walter Kimbrew was no longer "seized" as determined under the Fourth Amendment; thus, Walter's sole grounds for constitutional challenge exist under the Due Process Clause. *See Wilkins v. May*, 872 F.2d 190, 193 (7th Cir.1989), *cert. denied*, 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990).

■ Walter Kimbrew claims that he was unreasonably detained pending final confirmation of field test results and was further unlawfully detained subsequent to the return of negative laboratory results. On these issues the recent Seventh Circuit case of *Garcia v. City of Chicago*, 24 F.3d 966 (7th Cir.1994) *rehearing and suggestion for rehearing en banc denied* (August 15, 1994), is controlling. In *Garcia*, Rafael Garcia, while on probation for an unrelated matter, was arrested for possession of a controlled substance on March 15, 1991; the suspected substance was sent for testing the next day. Subsequent to a judicial of probable cause pursuant to *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), Garcia was detained and his probation revoked. On March 26, 1991, the final laboratory test results indicated the substance found in Garcia's possession at the time of the arrest did not contain any controlled substances. The State's Attorney's office moved for a *nolle prosequi* on April 10, 1991, and Rafael Garcia was released from custody April 15, 1991. *Garcia* 24 F.3d at 968.

Garcia then brought an action under § 1983 seeking money damages alleging, among other things, that "the City of Chicago's procedures for testing substances were constitutionally inadequate." 24 F.3d at 968. The Seventh Circuit addressed Mr. Garcia's relative rights under the Due Process Clause in two parts: 1) rights to speedy confirmation of initial test results while detained; and

2) rights to be released once the prosecutor is in possession of exculpatory evidence. 24 F.3d at 970–71. First, although the probation revocation caused by the judicial determination of probable cause complicated any rights that Rafael Garcia may have otherwise had regarding his term of incarceration, the *Garcia* court addressed the relative merit of an action contesting effectiveness of testing procedures. 24 F.3d at 970–71. The *Garcia* testing procedure was accomplished within a ten day period, but the court declined to find, indeed *could not fathom,* how what was effectively a twenty-five day turn around could be constitutionally deficient. 24 F.3d at 970.

Additionally, although this Judicial District has in the past refused to recognize a substantive right to speedy confirmation of preliminary evidentiary findings, *See Pennington v. Hobson,* 719 F.Supp. 760, 771 (S.D.Ind. 1989), the *Garcia* holding appears to have virtually eliminated any hope for such right; the *Garcia* court noted a concerned would-be § 1983 plaintiff should instead exercise the right for self testing under the Fourth Amendment's Compulsory Process Clause. 24 F.3d at 970 n. 5. This creates an interesting question in the case of a plaintiff proceeding *in forma pauperis,* such as Walter Kimbrew, but this issue will not be addressed, however, as the coverage of the *Garcia* holding appears to preclude lenient rulings on this issue.

Walter Kimbrew was arrested November 12, 1989. A judicial determination of probable cause to arrest pursuant to *Gerstein,* 420 U.S. 103, 95 S.Ct. 854, was made November 13, 1989. The evidence seized from Walter Kimbrew during the arrest was placed into the Evansville Police Department's evidence locker the day of the arrest, thereby setting into motion the testing mechanism. On the date of his arrest Walter was on probation pursuant to Vanderburgh County Circuit Court Criminal Cause Number 6473, an unrelated matter. Prior to the arrest date, through actions unrelated to the present matter, Walter Kimbrew violated the terms of his probation giving cause to the State of Indiana to file a Petition for Revocation of Intensive Supervision Program on October 24, 1989. Obviously due to his incarceration commencing November 12, Walter Kimbrew failed to appear at a November 16, 1989 revocation hearing causing the issue of a bench warrant. Apparently after learning he was detained on a different matter, on November 22, 1989, Vanderburgh County Circuit Court ordered Walter Kimbrew held in Vanderburgh County Jail pending further order. The laboratory test results were returned to the Evansville Police Department on December 11, 1989.

The present facts differ slightly from those in *Garcia,* but it is controlling nonetheless. Addressing only the period of detention from the initial arrest until the final laboratory determination, the Seventh Circuit has squarely held there exists no substantive right to speedy confirmation of preliminary evidence. 24 F.3d at 970. Walter Kimbrew's position is further complicated by his probationary status at the time of the arrest, thus reducing the questionable period to a mere ten days. The ten days in question here is derived from Walter's detention from November 12 until November 22, thereafter he was being held pursuant to a court order relative to the pending probation revocation. In light of *Garcia* and the foregoing, this Court cannot conclude Walter Kimbrew's due process rights were deprived by virtue of his detention pending final determination of the laboratory results.

■ In the second part of the *Garcia* analysis, the Seventh Circuit went on to address the implications of the time period between the receipt of the negative test results and the State's motion for *nolle prosequi,* the court stated:

What happens when the prosecutor discovers exculpatory evidence after a probable cause determination at a *Gerstein* hearing? Not all exculpatory evidence irrefutably proves the defendant's innocence. The decision to move for *nolle prosequi* is a matter of prosecutorial discretion, and the prosecutor can proceed to trial if the prosecutor believes doing so is warranted. In this case, in fact the prosecutor *did* dismiss the case well before trial, at the preliminary hearing—Garcia just contends that the delay from March 26 until April 10 . . . was too lengthy. The Due Process Clause,

however, does not compel prosecutors to dismiss its cases before trial based on exculpatory evidence in its possession, much less compel them to do so within fifteen days. *See Albright v. Oliver,* [——] U.S. [——], [——], 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (citing *Gerstein* for the proposition that the accused is not "entitled to judicial oversight or review of the decision to prosecute.")

*Garcia,* 24 F.3d at 971 (emphasis original). Presently, the questionable period of prosecutorial discretion was not fifteen days, but twenty-eight. Splitting hairs over the differential is not in order here in light of the spirit of the *Garcia* holding. Under that holding this Court is compelled to hold Walter Kimbrew was not deprived of his Due Process rights by being held subsequent to the return of negative tests results.

As an additional matter, Walter Kimbrew initially claimed the detention constituted a violation of his Eighth Amendment rights in addition his Fourteenth Amendment due process rights. Accordingly, it is relevant at this point to note that once an arrested person is charged, but before he is convicted, questions pertaining to the manner or duration of confinement passes over from the Fourth Amendment to the due process clause; after conviction, it becomes an Eighth Amendment issue. *Wilkins v. May,* 872 F.2d 190, 193 (7th Cir.1989), *rehearing denied, cert. denied* 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990); *Villanova v. Abrams,* 972 F.2d 792 (7th Cir.1992). This Court's analysis of the propriety of Walter Kimbrew's detention is set forth above, as Walter was never convicted in this matter, further analysis under the Eighth Amendment would be misplaced.

*Liability Under § 1983*

■ There having been found a deprivation of Walter Kimbrew's Fourth Amendment rights to be free of illegal search and seizure, a § 1983 liability analysis is in order. Regarding first the individual liability, Defendants Yeager, Erk, and Evans are named in this action by their titles as "officers." Personal capacity civil rights suits seek to impose personal liability on a government official for actions he takes under color of law; in contrast, an official capacity suit is effectively a suit against the governmental body which the individual represents. *See Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Plaintiff's complaint, filed *pro se,* named the Evansville Police Department in addition to the three police officers. Generally, absent express statements that the parties are to be implicated in their personal capacities, an allegation of actions under color of law is construed as an official capacity suit only. *Yeksigian v. Nappi,* 900 F.2d 101, 104 (7th Cir.1990). In *Duckworth v. Franzen,* 780 F.2d 645, 650 (7th Cir.1985), however, the Seventh Circuit chose to treat the individual versus official capacity distinction logically and was inclined accept substance over form. The *Duckworth* court did not undermine the procedural requirements of the distinction, in fact the court admonished the civil rights bar to clearly state the nature in which defendants are being implicated, but when confronted with a situation where procedural distinctions were illogical, the court opted for a reasonable standard. *Id.* This Court is in complete agreement, the bar should and will be held to strict procedural standards. Presently, however, the complaint was filed *pro se.* Further, it is difficult to presume that Walter Kimbrew intended to redundantly implicate the City of Evansville four times over. It is much more logical to presume that Walter Kimbrew named three of the four officers involved in his arrest because he felt they individually had done him some wrong. Due to the general theme of leniency which is afforded to *pro se* litigants, *See Talley v. Lane,* 13 F.3d 1031, 1033 (7th Cir.1994), coupled with the application of the substance theories of *Duckworth,* this Plaintiff will not fail for want of procedural specificity by naming these three individual Defendants by the only names he deemed proper to be filed in this Court. Officers Erk, Yeager, and Evans, therefore, are implicated in this matter in their personal capacities.

■ In reviewing the individual defendants, liability will only attach to Officer John Evans. Individual liability under

§ 1983 will only lie where the evidence proves that the individual was directly responsible for Plaintiff's deprivations. *See Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983).

Regarding the search violative of his Fourth Amendment rights, Walter Kimbrew has failed to set forth evidence sufficiently showing Officers Yeager or Erk were directly responsible for either the unlawful search or seizure. Officers Erk and Yeager, therefore, cannot be held individually liable in this matter. Walter Kimbrew has, however, provided this Court with evidence sufficient to determine Officer John Evans was directly responsible for the unlawful search and seizure contravening Walter Kimbrew's Fourth Amendment rights and thus may be held liable under § 1983.

The potential for liability of Officer John Evans accordingly brings to issue the availability of qualified immunity. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The *Harlow* test has been treated as an objective test protecting the public interest in deterrence while safeguarding the official's ability to make difficult decisions "with independence and without fear of consequences." 457 U.S. at 819, 102 S.Ct. at 2739. *Donovan v. City of Milwaukee,* 17 F.3d 944, 951 (7th Cir.1994). The Seventh Circuit has applied the test to give the official the legal benefit of the doubt, but where the right violated is clearly established such "that a reasonable official would understand that what he is doing violates that right," the official is not immune. 17 F.3d at 951–52 (internal quotations omitted); *Accord Rice v. Burks,* 999 F.2d 1172, 1174 (7th Cir.1993) ("Police officers who use force in making an arrest are entitled to qualified immunity from suits for damages ... 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow* )). The crucial inquiry is whether the law was clear in relation to the circumstances confronting the police officer. *Maxwell v. City of Indianapolis,* 998 F.2d 431, 436 (7th Cir.1993). This places on a civil rights plaintiff the heavy burden of "establishing the existence of a clearly established constitutional right [violated]." 17 F.3d at 951. The Seventh Circuit heightened that burden going so far as to hold that qualified immunity is "designed to shield from civil immunity all but the plainly incompetent or those who knowingly violate the law." *Hughes v. Meyer,* 880 F.2d 967, 971 (7th Cir.1989) *cert. denied, Hughes v. Buss,* 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1985)).

Under the present facts, it is this Court's view that Walter Kimbrew has carried that burden. The Fourth Amendment rules reviewed above are not new. The landmark decision in *Terry v. Ohio,* decided some years before Officer Evans began wearing a uniform, was in 1967 and still is a very prosecution-favorable case. The Supreme Court has respected *Terry* for the well reasoned decision that it is, and time and again the highest court has declined to broaden *Terry* to an extent undermining the Fourth Amendment itself. *See, e.g., Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Ybarra*

*v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1980); *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Minnesota v. Dickerson,* 508 U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993). The state of this aspect of the Fourth Amendment has not been in doubt since the 1967 holding in *Terry,* accordingly Officer John Evans is not entitled to qualified immunity and is, therefore, personally liable for his actions.

In ruling on the City of Evansville's potential liability, this Court need look no further than the law of *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and its progeny. In *Monell,* the Supreme Court held a municipality could be liable under § 1983, overruling the 17 year precedent of *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In overruling *Pape,* the *Monell* court extended § 1983 liability to municipalities not on the basis of *respondeat superior,* but limited to when the offensive conduct could be found to be in keeping with a municipal policy or custom. 436 U.S. at 694, 98 S.Ct. at 2037.

In finding municipal liability under § 1983, the Supreme Court has held that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Thereafter, however, the Supreme Court held that a *Monell* policy could be found "[i]f the decision to adopt a particular course of action is properly made by [a] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106

S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). "[M]unicipal § 1983 liability attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483, 106 S.Ct. at 1300. In other words, the Supreme Court reasoned that municipal liability could not be imposed merely because an employee had discretion in the discharge of his or her duties; an official must "be responsible for establishing final governmental policy" in order for municipal liability to attach to his decision. *Id.*

Turning to the instant facts, Walter has failed to set forth any evidence concerning a municipal policy or custom concerning the Fourth Amendment violation. This Court has found that Officer John Evans violated Walter Kimbrew's Fourth Amendment rights to be free of search and seizure, but there has been no evidence that the City of Evansville or the Evansville Police Department supports or recognizes such a policy. Nor can this Court find that Officer John Evans could qualify as a policymaker or decisionmaker for the purposes of *Pembaur v. City of Cincinnati.* Thus, as there has been no evidence in satisfaction of *Monell,* there can be no municipal liability concerning the Fourth Amendment violation. The City of Evansville should take note, however, of holdings such as *Powe v. City of Chicago,* 664 F.2d 639, 651 (7th Cir.1981), where isolated incidents can contribute to a pattern giving rise to an inference of an official policy.

*Damages*

Having found Officer Evans liable for violating Walter Kimbrew's Fourth Amendment right to be free from unlawful search and seizure, we turn now to the question of damages. Both compensatory and punitive damages are available to litigants under 42 U.S.C. § 1983. *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (compensatory damages); *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1982) (punitive damages). In his complaint filed *pro se* with this Court, Walter Kimbrew requested

$1,000,000 in compensatory and punitive damages.

■■■ Damages (other than punitive damages) under 42 U.S.C. § 1983 exist solely to provide compensation for harms actually suffered. *Stachura*, 477 U.S. at 307, 106 S.Ct. at 2543. Absent evidence of such actual harm, the most a plaintiff may recover is nominal damages for the violation of a constitutional right. *Stachura*, 477 U.S. at 310, 106 S.Ct. at 2544; *Carey v. Piphus*, 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1977). Walter Kimbrew has shown no actual damages resulting from the unlawful search. Nevertheless, Walter's rights were violated, and we grant nominal compensatory damages in the amount of $1 for the violation of plaintiff's Fourth Amendment right to be free from unlawful search and seizure.

■■■ We now turn to the question of punitive damages. Punitive damages are available under 42 U.S.C. § 1983 in cases where a defendant shows "reckless or callous disregard for the plaintiff's rights" or intentionally violates federal law. *Smith v. Wade*, 461 U.S. at 51, 103 S.Ct. at 1637. In this case, Walter Kimbrew appears to have had his Fourth Amendment rights violated simply because he was at the wrong place at the wrong time. It is further apparent that Officer Evans was content to violate the Fourth Amendment rights of any individual placed in Walter's situation. Officer Evans' actions were inappropriate and it is this Court's view he was fully aware of that fact. We therefore find that punitive damages are appropriate in this matter.

■■■ In setting the amount of punitive damages, we are guided by the objectives of deterrence and punishment. *See McKinley v. Trattles*, 732 F.2d 1320, 1327 (7th Cir. 1984). In *McKinley*, the United States Court of Appeals for the Seventh Circuit upheld a jury award of punitive damages for an improper prison strip search, but found the award of $15,000 to be excessive and on remand set as a guideline an upper limit of $6,000. *Id.* at 1327. In *Bogan v. Stroud*, 958 F.2d 180 (7th Cir.1992), the United States Court of Appeals for the Seventh Circuit upheld a jury award of punitive damages in the amount of $5,000 against one defendant and $1,000 each against two others as a result of an altercation in prison.

In this case, Walter Kimbrew was not a prisoner as in *McKinley* or *Bogan*, but a person on the street, subjected to an invasion of his personal effects and clothing based on an inarticulable suspicion or paranoia. As indicated above, Officer Evans appeared before this Court to be generally indifferent to the rights of Walter Kimbrew or any other individual. In light of this callous lack of concern, this Court finds damages in the amount of $2,500 best serve the objectives of deterrence and punishment.

■■■ The award of attorney's fees, however, is inappropriate in this matter. As the Supreme Court addressed in *Farrar v. Hobby*, — U.S. —, —, 113 S.Ct. 566, 575, 121 L.Ed.2d 494, 506 (1992), while a civil rights plaintiff receiving nominal damages is indeed the prevailing party, "the only reasonable fee is usually no fee at all." In *Cartwright v. Stamper*, 7 F.3d 106, 109 (7th Cir. 1993), the Seventh Circuit found the *Farrar* decision to require analysis of such an award, or refusal to award, to involve the following considerations: "[1] the difference between the judgment recovered and the recovery sought, [2] the significance of the legal issue on which the plaintiff prevailed and finally, [3] the public purpose served by the litigation." The *Cartwright* court further found the first prong to be the most important consideration and the second to be the least important, with the third somewhere in between. 7 F.3d at 110.

In the case at bar, *Cartwright* is not favorable to Walter Kimbrew. Under the first factor, Walter is awarded $1 when he asked for $1,000,000, thus he has failed miserably on the most important factor. Secondly, regarding the legal significance of Walter's claim, it should be obvious this Court holds the United States Constitution in a very high regard, but similar to the recent Seventh Circuit holding in *Maul v. Constan*, 23 F.3d 143 (7th Cir.1994), further analysis is not warranted as this factor is heavily outweighed by the other two. Finally, regarding the public purpose served by Walter

Kimbrew's suit, the recent Seventh Circuit cases are instructive:

> since all Section 1983 claims seek to redress "the deprivation of ... rights, privileges, or immunities secured by the Constitution and laws ...," 42 U.S.C. § 1983, this factor is satisfied merely because the plaintiff establishes, as he did here, that his constitutional rights have been infringed. Instead, this Court must scrutinize plaintiff's complaint to determine whether the allegations made and the relief sought evince a public purpose rather than merely attempt to redress a private injury.

*Maul,* 23 F.3d at 146 (quoting *Cartwright,* 7 F.3d at 110) (omissions original). On this third factor, while he may have filed this claim representatively in spirit, there can be no dispute that in actuality Walter Kimbrew sought only to redress a private wrong. Attorney's fees are therefore inappropriate in this matter.

**IT IS SO ORDERED.**

### JUDGMENT

The Court, having heard all the evidence and having entered on this date its findings of fact and conclusions of law in the above styled cause, now enters judgment:

1. Judgment is entered in favor of Defendants Evansville Police Department, Alan Yeager, and Donald Erk, and against Plaintiff Walter Kimbrew.

2. Judgment is entered in favor of Plaintiff Walter Kimbrew and against Defendant John Evans in the following amount:

| | |
|---|---|
| A. Compensatory Damages | $ 1.00 |
| B. Punitive Damages | 2,500.00 |
| **TOTAL** | $2,501.00 |

**IT IS SO ORDERED.**