UNITED STATES of America,
Plaintiff,

v.

**Filipo Sione MATAU; Faalili Afele, also known as "Feilisie Topuola" and "Jacob Motu", Defendants.**

**No. CR. 00–00473 SOM.**

United States District Court,
D. Hawaii.

Feb. 25, 2002.

Michael K. Kawahara, Assist. U.S. Atty., Honolulu, HI, for plaintiff.

Barry D. Edwards, Honolulu, HI, for defendants.

*AMENDED ORDER DENYING DEFENDANT FILIPO SIONE MATAU'S MOTION TO SUPPRESS EVIDENCE*

MOLLWAY, District Judge.

## I. INTRODUCTION.

Defendant Filipo Sione Matau ("Matau") is charged with conspiracy to distribute or

possess with intent to distribute 50 grams or more of crystal methamphetamine. In the present motion, he seeks suppression of all evidence derived from a search of his person and effects due to an allegedly unlawful detention, arrest, search, and/or seizure. Matau seeks to suppress the evidence based on several grounds. First, he argues that his initial encounter with law enforcement constituted a temporary detention without reasonable suspicion. Second, Matau argues that he was arrested without probable cause. Third, Matau claims that all evidence seized from his person and property must be suppressed as fruits of the alleged illegal investigation. Matau additionally seeks suppression of all statements made pursuant to his detention. Matau argues that any statements made to the agents who arrested him were fruits of the allegedly unlawful detention and arrest and were not voluntary.

The court denies Matau's motion to suppress because the government has demonstrated that the initial encounter and search were consensual, that there was probable cause for the arrest, and that the evidence in issue was therefore lawfully obtained.

## II. *FINDINGS OF FACT.*

This court received oral testimony from Honolulu Police Department narcotics Detective Rosalie Lenchanko ("Lenchanko") and Officer Derrick Martin ("Martin"). In an effort to rule promptly on the merits and to avoid the burden on the court's over-extended court reporters, the court did not request and therefore does not have final transcripts of the live testimony. Therefore, in referring to that testimony in these findings of fact, this court is unable to give exact page and line citations to the testimony. Based on the live testimony and the exhibits received in evidence, the court finds the following by a preponderance of the evidence.

1. Detective Rosalie Lenchanko ("Lenchanko"), a Honolulu Police Department officer since 1980, has been assigned to the Narcotics Vice Airport Detail ("NVAD") at Honolulu International Airport, since November 1997. Lenchanko is also a member of the Drug Enforcement Agency ("DEA") Airport Drug Task Force and in this capacity has been federally cross-designated as a DEA Task Force Officer.

2. As both Lenchanko and Martin testified, on December 4, 2000, Lenchanko and Martin were partners assigned to investigate drug trafficking at Honolulu International Airport. At approximately 1:05 p.m., Lenchanko and Martin observed passengers at Gate 13 arriving off of Continental Airlines flight # 75, inbound from Los Angeles, a known drug source area. Lenchanko and Martin both wore civilian clothing, with no weapons visibly displayed.

3. When about half the passengers had gotten off the plane, Lenchanko saw a person, later identified as Matau, come off the plane carrying a green and white floral-print bag about 20″ long, 13″ deep, and 7½″ wide. *See* Government's Exhibit 4. According to Lenchanko, Matau did not look outwardly suspicious at the time he left the plane. However, Matau caught her eye because he reminded her of a drug courier that she had previously arrested in another case. Matau's stature and his Polynesian (or, more specifically, Samoan) background reminded Lenchanko of the other person.

4. After leaving the gate, Matau and a group of passengers proceeded towards an escalator leading to the assigned baggage claim area for this flight. Lenchanko followed the group, while Martin remained at the gate for a few seconds, then followed her. Lenchanko testified that she decided to follow the group for further observation but that, although she had noticed Matau,

she had not at this time focused her observation on Matau. In possible contradiction, Martin testified that Lenchanko told him right at the gate that she was going to follow Matau. This possible conflict in testimony is immaterial to this court's decision. Even if, as urged by Matau, this court were to find that Lenchanko had singled out Matau from the instant she saw him, the court's findings and ruling would be unchanged.

5. The court notes that it is possible to interpret Martin's statement as consistent with Lenchanko's. Lenchanko may have told Martin that she was going to follow the person who reminded her of a prior arrestee simply as a way of stating where she intended to go, rather than as an indication that she had singled out Matau for observation. Lenchanko might have referred to Matau simply by way of identifying her direction, much as she might have referred to a woman in a fuchsia dress heading in a particular direction.

6. Matau argues that Lenchanko had singled out Matau for observation solely because of his race. This court finds that, even if Lenchanko singled Matau out for observation upon first seeing him, the evidence establishes that she did not do so based on Matau's race. Most important to this court is Lenchanko's testimony that Matau first caught her eye because he "reminded" her of an arrestee in another drug case. Although, when asked for specific factors about Matau that reminded her of that other person, Lenchanko mentioned race as a factor, the court, viewing Lenchanko's testimony as a whole, finds that she considered factors other than race. A person reminds one of another because of a full array of factors, including facial features, mannerisms, expression, etc. Indeed, Lenchanko also specifically mentioned Matau's "stature." The court finds that Lenchanko was reminded of another arrestee because of Matau's overall appearance, not solely because of his race.

7. The court does not find that Lenchanko was even partially motivated by race. Lenchanko's initial testimony was that Matau "reminded" her of another arrestee who had been found to possess drugs. It was only when pressed to provide details that she mentioned race as a common factor. While it is certainly not necessary that people who remind one of each another be of the same race, if the people coincidentally happen to be of the same race, the mere mention of the common race does not mean that the observer is motivated by racial considerations. While Lenchanko failed to mention similarities between Matau and the other arrestee other than stature and race, the court recognizes the difficulty of articulating similarities between people. Lenchanko's response when asked to detail the similarities reflected that difficulty. Her response was not so flip as to reflect a casual attitude toward race, nor so hesitant or guarded as to suggest an intent to disguise what a responder might fear would be considered an inappropriate mindset. Rather, Lenchanko's manner of responding was direct, but thoughtful.

8. Lenchanko testified that she herself is half-Hawaiian and half-Caucasian, so she is not someone who would think all Polynesians look alike simply because they are Polynesian. Moreover, Lenchanko demonstrated enough familiarity with Samoans to lead the court to think that she could distinguish among Samoan men and would not be "reminded" of one Samoan man by all other Samoan men. For example, Lenchanko said she had heard the Samoan language spoken enough to think she could recognize when it was being spoken, even though she did not speak Samoan. The court notes also that Lenchanko was not so focused on Matau's race that she could

even remember whether any other Samoan passengers had gotten off of Matau's flight. Had Lenchanko been motivated by race, she would likely have noticed whether there were other Polynesians in the crowd, a highly likely possibility at Honolulu International Airport.

9. Matau went down the escalator, and Lenchanko followed him. Lenchanko was about 15 feet behind Matau as he got off the escalator. The group went through sliding doors at the bottom of the escalator and proceeded into the baggage claim area. Then, while the other members of the group headed toward the baggage claim area assigned to the flight, Matau quickened his pace and headed rapidly towards a set of exit doors. This was the first thing Matau did to set him apart from other passengers. Lenchanko followed Matau out of the baggage claim area. Lenchanko noted that Matau's carry-on bag was small enough to suggest that, given the absence of other luggage, Matau was on a quick turnaround trip to Hawaii. Lenchanko testified that, in her experience, drug couriers often travel on quick turnaround trips.

10. After getting out of the building, Lenchanko saw Matau walk to the curb, where a black Chevrolet Tahoe SUV ("SUV") was parked. A man later identified as Defendant Faalili Afele ("Afele") was sitting in the driver's seat. Matau opened the passenger side front door and threw his carry-on bag onto the front seat without appearing to exchange any greeting or having any other personal contact with Afele. Lenchanko testified that she found this behavior typical of drug couriers, who consider their trips to involve pure business and who do not display the greetings that returning or arriving passengers normally display to friends or family at the airport.

11. At approximately 1:15 p.m., Lenchanko approached Matau at curbside as he was getting into the SUV. Lenchanko showed Matau her identification card at hip level and asked Matau if he would talk with her. Matau, who had one foot in the SUV, nodded his head and stepped back onto the sidewalk, leaving the car door open. Lenchanko asked Matau if he would bring his luggage with him. Matau removed his bag from the SUV and placed it at his feet on the sidewalk. Afele leaned over towards his right as if to hear what Matau and Lenchanko were talking about.

12. Lenchanko told Matau that she was with the DEA, that she investigated drug trafficking coming through the airport, that Matau was not under arrest, and that he was free to leave if he wanted to. Matau nodded his head in acknowledgment.

13. Lenchanko then asked to see Matau's airline ticket. Matau bent over, removed an airline ticket jacket from the sidepouch of his bag, and handed it to Lenchanko. When Lenchanko found that the ticket jacket was empty, she asked Matau where the ticket receipt was. Matau said that he had gotten an electronic ticket at the airport. Lenchanko thought it was unusual that Matau did not have a ticket receipt, although she acknowledged that it was possible that Continental did not routinely give ticket receipts for electronic tickets. She again asked Matau if he had a ticket receipt, and Matau said that he did not know.

14. Lenchanko then asked Matau if he had an airline boarding pass. Matau said that he did not know what had happened to it. As Lenchanko had had drug couriers in other drug cases dispose of travel documents because they did not want law enforcement officials to know how they had traveled, she "kind of keyed in" on Matau's absence of travel documents.

15. Lenchanko returned Matau's empty ticket jacket to him. Lenchanko no-

ticed that, as Matau reached for the ticket jacket, his hand was visibly shaking and there was "quite a lot" of perspiration on Matau's forehead even though it was December and Lenchanko did not think the day was unusually hot.

16. Lenchanko then asked to see some identification. Matau handed Lenchanko a California driver's license. *See* Government's Exhibit 1. The license bore Matau's photograph, was issued in the name of "Filipo Sione Matau," and listed his address as "6829 E 72nd Street, Paramount CA 90723." The plastic laminate covering the face of the license was "bubbled up" in several areas, although it was still attached to the license around the edges.

17. The "bubbling up" of the laminate made Lenchanko wonder whether the license was genuine. Lenchanko then asked Matau where he lived. Matau looked at Lenchanko for several seconds in silence before replying that he lived in California. Lenchanko asked Matau what his address was. Matau paused for several seconds before stating, "72nd Street," without giving the actual street address. To Lenchanko, Matau appeared to be trying to remember his address. Lenchanko thought this suggested that Matau was trying to recall what was written on the license, as if the license did not have his real address, which he presumably would have been able to recite without hesitation. Lenchanko was also concerned that there were no travel documents to match up against the license so that she could see whether the names were the same.

18. Lenchanko handed the license back to Matau and asked why Matau was coming to Hawaii. Matau replied that he was in Hawaii to visit a friend and that Afele was going to take him to see his friend. Lenchanko thought that a person coming to Hawaii to visit a friend would likely not have been on a quick turnaround trip and would therefore likely have had more luggage than Matau had.

19. At this time, Afele leaned over from the driver's side of the SUV and asked Lenchanko what was going on. Lenchanko identified herself to Afele and explained that she was investigating drug trafficking. She told Afele that her questioning was routine, that she did this daily, and that she would take only a few minutes.

20. Afele became anxious and said that he knew nothing about drugs. He said that all he knew was that he was supposed to pick Matau up. He said that he was going to leave. He became increasingly nervous and kept reaching for his keys, which were in the ignition. Lenchanko thought Afele's actions were unusual for someone who was supposed to be picking Matau up to take him to see a friend. Lenchanko asked Afele, "Aren't you going to wait for your friend?" Afele waited.

21. Lenchanko then asked Matau if he would consent to a "patdown" of his person and a search of his bag. Lenchanko also said that it would only take a few minutes because he had only one small bag. Matau said, "Okay."

22. Afele leaned over from the driver's side again to ask what was going on. Lenchanko told him that Matau had just consented to a "patdown" of his person and a search of his bag. Afele called over to Matau that Matau did not have to allow that and should "just tell them 'no.'" Afele said that the questioning was "a lot of bullshit." Afele's comments to Matau were in pidgin English. To Lenchanko, who speaks Hawaiian but not Samoan, Afele seemed to be speaking in English with a mixture of what she thought were Samoan words. Lenchanko testified that she has heard the Samoan language spoken and based her conclusion on that experience. Lenchanko did not understand the

words she thought were in Samoan, but she was able to understand the gist of Afele's comments to Matau. After hearing Afele's comment, Matau told Lenchanko that he would not allow the "patdown" and search.

23. Lenchanko then told Matau that she would be calling for a narcotics detector dog to sniff his bag and that this would take a little longer. Matau replied by asking Lenchanko whether she had a warrant to search the bag. Lenchanko was taken aback by Matau's question, then told Matau she did not need a search warrant to do a dog sniff of his luggage.

24. Afele called over to Matau that Matau should allow the "patdown" and search. Matau then turned to Lenchanko and agreed to the "patdown" and search. Lenchanko confirmed Matau's consent by saying that there would be a "patdown" and a search of Matau's bag. She pointed to Martin and told Matau that Martin would conduct the "patdown," so that Matau would know that a male would search him. Matau said, "Okay." This was probably the first time that Matau saw Martin, who had been providing "back up" for Lenchanko by standing about five feet behind Matau while Lenchanko was speaking to Matau.

25. According to Martin, Matau raised his hands in "a bird fashion" to permit Martin to pat him down. Martin patted Matau down and then searched Matau's bag on the sidewalk near Matau. Martin found what appeared to be crystal methamphetamine hidden in a pair of socks in Matau's bag. Matau's boarding pass was found in the bag, although it is not clear from the evidence presented to the court whether Martin found them while searching the bag on the sidewalk or later.

26. Immediately after Martin found what appeared to be drugs, Lenchanko arrested Matau. The arrest occurred at approximately 1:20 p.m. Up to this point, Lenchanko had been with Matau about five minutes. Matau was taken to the DEA airport office for questioning. Afele was also arrested later on December 4, 2000.

27. At about 1:50 p.m., Lenchanko orally advised Matau of his constitutional rights by reading them from a DEA Form 13a "Oral Warnings" card. *See* DEA Form 13a card, Government's Exhibit 2. Matau acknowledged that he understood his rights and was willing to answer questions.

28. After Matau had been read his *Miranda* rights and had acknowledged his willingness to answer questions, Lenchanko interviewed Matau at several intervals during the afternoon and evening of December 4, 2000. Matau discussed himself and his own role in the drug trafficking scheme, but was reluctant to implicate others. After some time, Matau named persons in Hawaii involved in drug trafficking. However, Matau adamantly refused to discuss the people involved in Los Angeles.

29. Matau said that he knew where one of the people involved in drug trafficking in Hawaii lived.

30. At no time during the interview process did Matau request an attorney or indicate difficulty understanding spoken and/or written English. Matau seemed to understand what Lenchanko was asking and responded without asking her to repeat her questions.

31. Matau's oral statements to Lenchanko were ultimately incorporated into a typewritten statement, which Lenchanko prepared. *See* Statement of Filipo Sione Matau, Government's Exhibit 3. Matau had a chance to read this statement and to make changes before signing it. Matau nodded his head as he read over the statement Lenchanko had typed, and he initialed the beginning and end of every paragraph in the statement. He signed it at

approximately 9:00 p.m. on December 4, 2000.

32. Lenchanko explained that Matau was held at the airport office for about seven hours because she could not devote her attention entirely to interviewing him. Lenchanko was involved with preparing related documents and with dealing with Afele around the same time. She said that Matau had one hand handcuffed to a bar in the office during at least part of the time, although he may have had his hands free while being intermittently interviewed. She said Matau was fed during the time he was at the office, and from time to time he was left alone.

33. Later that night, Matau took law enforcement officers to the apartment complex where someone he said was involved in drug trafficking lived.

### III. CONCLUSIONS OF LAW.

*Lenchanko's Initial Contact with Matau was Consensual.*

■■■ 1. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). This right of personal security applies to a person on the streets. *See Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stating "[u]nquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street"). The Fourth Amendment does not forbid all searches and seizures, only unreasonable ones. *See id.* at 9, 88 S.Ct. 1868.

2. Before the court analyzes whether a search or a seizure is reasonable or unreasonable, there must first be a "search" or a "seizure." *Yin v. State of California*, 95 F.3d 864, 874 (9th Cir.1996). A consensual encounter with an officer is not a "seizure of a person" that implicates Fourth Amendment protections. *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). An exchange is consensual if a reasonable person would feel free to walk away, decline to answer the officers' questions, or otherwise terminate the encounter. *Mendenhall*, 446 U.S. at 555, 100 S.Ct. 1870.

3. The Ninth Circuit has ruled that officers may conduct this kind of consensual inquiry:

> Law enforcement officers do not violate the fourth amendment by approaching an individual in a public place and putting questions to him or her. The person so questioned need not answer any questions and is legally free to ignore the officer, or to walk away. His or her voluntary answers to the officer's questions are admissible in a criminal prosecution. The fact that the officer identifies himself as a police officer does not convert the encounter into a seizure requiring some level of objective justification.

*United States v. Woods*, 720 F.2d 1022, 1026 (9th Cir.1983) (citations omitted). *Accord United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1505 (9th Cir.1988) (holding that a person is not seized under the Fourth Amendment when an officer asks for identification and an airline ticket); *Benitez–Mendez v. INS*, 760 F.2d 907, 909 (9th Cir.1983) (approaching a person in an open field and asking him several questions to which the person responds voluntarily is not a seizure). If a police encounter is not consensual, or if a consensual encounter at some point becomes nonconsensual, that encounter may be a seizure that implicates the Fourth Amendment. *Terry*, 392 U.S. at 16, 88 S.Ct. 1868 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person").

4. The government has the burden of proving that the encounter between Matau and the officers was consensual. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality decision) ("where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority"); *Mendenhall*, 446 U.S. at 558, 100 S.Ct. 1870. The government must prove the voluntariness of the consent by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Whether the consent given to search was freely and voluntarily given is a question of fact to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

5. Lenchanko initiated her questioning of Matau without touching him. She did not try to block Matau or to physically prevent him from leaving. Lenchanko identified herself and informed Matau that he was not under arrest and was free to go. Matau agreed to answer questions, and Lenchanko then asked Matau questions for just a few minutes. A reasonable person in Matau's position would have felt free to walk away, decline to answer Lenchanko's questions, or otherwise terminate the encounter. *See Mendenhall*, 446 U.S. at 555, 100 S.Ct. 1870. This initial encounter up to the point that Lenchanko indicated that she was going to hold Matau's bag for a dog sniff was therefore consensual. *See United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir.1994) (holding that, even where officers come to a parked car and ask questions to a person seated inside, the encounter is consensual and not an investigatory stop if the person feels free to leave).

■ 6. Even assuming ·Lenchanko picked Matau out for observation because of his race, Lenchanko's questioning of him was allowed under Ninth Circuit law.

7. The court is certainly not condoning any practice based on race and recognizes that "[c]onsideration of racial appearance alone cannot furnish a reasonable articulable suspicion passing muster under the Fourth Amendment." *See Kim*, 25 F.3d at 1431 (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 885–86, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). However, the issue before this court involves a consensual encounter, not a detention or seizure. The Ninth Circuit has addressed this issue and determined that a law enforcement's officer's motivation, even if inappropriate, is irrelevant in the context of an encounter that is not a detention or seizure. As the Ninth Circuit has said, "[W]here contact between the citizenry and law enforcement officials does not rise to the threshold of a Fourth Amendment event, the predicate for application of the exclusionary rule under *Brignoni–Ponce* is absent, the reasonable cause requirement nugatory, and the agent's motivation for approaching [a person] therefore irrelevant." *Kim*, 25 F.3d at 1431 (citing *INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)).

8. Accordingly, because the initial encounter between Lenchanko and Matau was consensual and the Fourth Amendment was not implicated, Lenchanko's motivation in singling out Matau is irrelevant. *See Kim*, 25 F.3d at 1431.

■ 9. Although the court concludes that Lenchanko's motivation is irrelevant under *Kim*, the court notes that, even if motivation were relevant to the issue of whether the consensual search was valid, the motion to suppress would be denied. In *United States v. Avery*, 137 F.3d 343 (6th Cir.1997), the Sixth Circuit held that, even if not prohibited by the Fourth

Amendment, surveillance based solely on race is prohibited by the Equal Protection clause. Under *Avery*, it is unconstitutional to conduct even surveillance before any contact with a target if the target is selected based solely on the target's race. The Sixth Circuit incorporates equal protection analysis into its review of consensual stops because "[a] citizen's right to equal protection of the laws ... does not magically materialize when he is approached by police." *Id.* at 353. Even if *Avery* were the law in this district, this court would conclude that Lenchanko's questioning of Matau was legal even if Lenchanko targeted Matau immediately upon seeing him. The court would reach that conclusion because Lenchanko, even assuming she singled Matau out from the instant she saw him, did so because he reminded her of another drug dealer, not solely because of his race. Even if the law went further than *Avery* and prohibited consideration of race as a factor at all, rather than only as the sole factor, the court would conclude that Lenchanko's actions were permitted by law, given the court's finding that Lenchanko was not motivated even in part by race and Matau's failure to meet his burden of showing otherwise. *See id.* at 355.

10. Matau cites inapposite cases in support of his argument that an interrogation is illegal if based on ethnic background. Each of the cases he cites involved an investigatory stop that fell under the Fourth Amendment, not a consensual encounter. *See Brignoni–Ponce*, 422 U.S. at 885–86, 95 S.Ct. 2574 (investigatory stop of vehicle may not be based solely on occupants' Mexican ancestry); *Gonzalez–Rivera v. INS*, 22 F.3d 1441 (9th Cir.1994) (investigatory stop of defendant based solely on the fact that defendant was Hispanic violates the Fourth Amendment); *United States v. Rodriguez*, 976 F.2d 592 (9th Cir.1992) (border patrol agents lacked reasonable suspicion to justify investigatory stop of defendant's vehicle); *United States v. Patterson*, 648 F.2d 625 (9th Cir. 1981) (investigatory stop proper under Fourth Amendment). As noted above, it is well settled that law enforcement officials may not conduct an investigatory stop of a person based solely on his or her race. *See Brignoni–Ponce*, 422 U.S. at 885–86, 95 S.Ct. 2574. However, a consensual encounter does not implicate the Fourth Amendment and does not rise to the level of an investigatory stop. *See Kim*, 25 F.3d at 1430. Moreover, Lenchanko did not begin investigating Matau based on his race.

*Matau's Bag was Properly Detained.*

11. Generally, a seizure of personal property without a judicial warrant based on probable cause is per se unreasonable and a violation of the Fourth Amendment. *Place*, 462 U.S. at 701, 103 S.Ct. 2637. However, a police officer may briefly hold a person's luggage without a warrant if that officer has "a reasonable, articulable suspicion" that the luggage contains narcotics. *Id.* at 706, 103 S.Ct. 2637. A determination of reasonable suspicion "requires an inquiry as to the facts and circumstances within an officer's knowledge" at the time of the temporary detention, not in hindsight. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993). In the present case, the holding of Matau's bag for a dog sniff was justified by Lenchanko's reasonable, articulable suspicion that Matau was carrying drugs.

12. Lenchanko's suspicion was based on her observations. First, by the time she mentioned a dog sniff, Lenchanko had seen Matau pass the baggage claim area without claiming any luggage, indicating that Matau was on a short turnaround trip to Hawaii. *See Unites States v. Jaramillo*, 891 F.2d 620, 622 (7th Cir.1989), *cert. denied*, 494 U.S. 1069, 110 S.Ct. 1791, 108 L.Ed.2d 792 (1990), *overruled on other grounds by United States v. Ornelas–Le-*

*desma,* 16 F.3d 714 (7th Cir.1994) (holding that "a short trip [is] the norm for drug couriers"). Second, she had heard Matau say that he was in Hawaii to visit a friend, and knew from experience that visits to friends in Hawaii are usually for more than a day and therefore usually involve more luggage than Matau had. Third, she had seen Matau get off a plane from a known drug source area, Los Angeles. Fourth, Matau had been unable to provide any of his travel documents. While Matau's boarding pass ultimately turned out to be in his bag, Lenchanko did not know that would happen at the time she told Matau about the dog sniff. Fifth, Matau had not greeted Afele as he began getting into the SUV. *See $25,000 Currency,* 853 F.2d at 1503 (one factor that may contribute to reasonable suspicion is a defendant's "quick exit from the car without exchanging good-byes"). Sixth, the "bubbling" up of the plastic laminate on Matau's driver's license had suggested to Lenchanko that the license might not be genuine. While the license turned out to be genuine, Lenchanko had a reasonable basis for being suspicious. Seventh, Matau had taken a long time to provide the name of the street he lived on, had not stated the street address, and had appeared to be trying to remember his address. Eighth, both Matau and Afele had appeared nervous, and Matau had been perspiring. Ninth, Afele had been prepared to leave and disassociate himself from Matau. Finally, Matau had agreed to the "patdown" and search of his bag, then had withdrawn his consent after Afele had advised him not to agree. *See United States v. Riley,* 927 F.2d 1045, 1049–50 (8th Cir.1991) (holding that one factor to examine when determining if an officer had reasonable suspicion is whether a defendant withdrew his consent to a search of his bags when it became apparent that such a search could be performed).

13. Taken together, these circumstances known to Lenchanko provided a reasonable suspicion that Matau was carrying drugs in his bag. *See Riley,* 927 F.2d at 1049–50 (holding that officers had reasonable suspicion sufficient to justify holding the defendant's luggage for a dog sniff when the defendant had flown in from Los Angeles, a known drug source city; was dressed in business attire on a late night flight but had inexpensive cloth luggage fastened with an unusually large padlock; had surveyed the airport nervously while picking up his ticket from the airline counter; had flown on an airline ticket paid for in cash by someone else; had been unable to keep his hands from shaking when he voluntarily produced his license and ticket; and withdrew his consent to a search of his bags when it became apparent that such a search could be performed). *See also United States v. Sokolow,* 490 U.S. 1, 8–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (reasonable suspicion established where nervous suspect travels under alias or takes elusive path through airport, fails to check luggage, pays cash for ticket, and stays only a brief time in Miami).

*Matau Voluntarily Consented to the Search of His Bag.*

14. After Lenchanko informed Matau that his bag would be detained for a dog-sniff, Matau agreed to the "patdown" of his person and the search of his bag. "An individual may waive his Fourth Amendment rights by giving voluntary and intelligent consent to a warrantless search of his person, property, or premises." *United States v. Torres–Sanchez,* 83 F.3d 1123, 1130 (9th Cir.1996). A consent search is proper if it is freely and voluntarily given and is not the result of duress or coercion. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. 2041. A suspect may still voluntarily give consent to search even

though he or she has already been detained or arrested. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

15. To determine whether a person voluntarily consented to a search, the court may consider, but is not limited to considering, the following factors: (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given before to the search; (4) whether the defendant was told he had the right to withhold consent; and (5) whether the officers claimed that they could obtain a search warrant. *See Torres–Sanchez*, 83 F.3d at 1129 (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir.1988)). No one factor is dispositive and the fact that some of the factors are not established "does not automatically mean that consent was not voluntary." *Torres–Sanchez*, 83 F.3d at 1130; *Castillo*, 866 F.2d at 1082.

16. Matau was not in custody at the time he consented to the search. *Miranda* warnings were therefore unnecessary before the search. *See Torres–Sanchez*, 83 F.3d at 1130. Lenchanko and Martin did not draw their guns or display their weapons at any time before the consent to search was given by Matau. Lenchanko's statement that she would detain Matau's bag for a narcotics detector dog sniff did not render Matau's consent to search involuntary. As noted above, Lenchanko's reasonable suspicion that Matau's bag carried drugs justified holding the bag for a dog sniff. *See United States v. Kaplan, M.D.*, 895 F.2d 618, 622 (9th Cir.1990) (noting that consent is voluntary even when an officer tells a defendant that he could obtain a search warrant "if the officer had probable cause upon which a warrant could issue"). Matau's understanding that he could refuse consent is evidenced by his withdrawal of his earlier consent to

search his bag. Matau even questioned Lenchanko about the need for a search warrant in connection with a dog sniff, demonstrating that he was not so intimidated that he could not express his position. Moreover, there is no evidence that Lenchanko used threats, violence, or other improper promises or influence to obtain Matau's consent to search the bags.

17. Matau's own post-arrest statement confirmed that his consent to search the bag was voluntary. Matau stated:

Detective Lenchanko then asked if it was alright for her to do a "pat down" of my body and if I would consent to the search of my bag. I said, "Okay." Then my friend Jeck told me to say "no", so I did. But after Detective Lenchanko explained that she would have to call a dog to come and sniff my bag, I thought about it and told her it was alright to search me and the bag.

*See* Statement of Filipo Sione Matau, Government's Exhibit 3.

18. Upon review of the totality of the circumstances, the court concludes that Matau's consent to the "patdown" of his person and search of his bag was voluntary. *See Torres–Sanchez*, 83 F.3d at 1130 (consent to search was voluntary when defendant was not under arrest and no guns or force was used, even though *Miranda* warnings were not given and defendant was not informed of his right to refuse the request for consent).

*There was Probable Cause to Arrest Matau.*

19. "Probable cause to arrest depends 'upon whether, at the moment the arrest was made ... the facts and circumstances within (the arresting officers') knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Adams v.*

*Williams,* 407 U.S. 143, 148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). Martin discovered what appeared to be crystal methamphetamine hidden in a pair of socks located in Matau's bag. Once Martin made this discovery, Lenchanko and Martin clearly had probable cause to place Matau under arrest. *See Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) ("Once petitioner admitted ownership of the sizable quantity of drugs found in Cox's purse, the police clearly had probable cause to place petitioner under arrest").

*Matau's Post–Arrest Statements Were Not the Fruit of the Poisonous Tree.*

■ 20. Matau further asserts that his statements to Lenchanko after he was arrested should be suppressed as the fruit of the poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, as noted above, Matau's Fourth Amendment rights were not violated by Lenchanko's questioning, the search of Matau's bag, his arrest, or the seizure of the crystal methamphetamine from the bag. Accordingly, Matau's post-arrest statements to Lenchanko were not the fruit of the poisonous tree.

*Matau's Post–Arrest Statements were Voluntary.*

■ 21. Matau contends that his post-arrest statements to Lenchanko and other law enforcement personnel and the waiver of his *Miranda* rights were involuntary.

22. A confession is legally voluntary only if it is "the product of a rational intellect and a free will." *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Medeiros v. Shimoda,* 889 F.2d 819, 823 (9th Cir.1989), *cert. denied,* 496 U.S. 938, 110 S.Ct. 3219, 110 L.Ed.2d 666 (1990).

23. To evaluate the voluntariness of a confession, the court determines "whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988) ("Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence").

24. Given the absence of threats, violence, or other improper promises or influence to obtain Matau's statements, and given the totality of the circumstances, the court concludes that Matau's statements to law enforcement agents were voluntary.[1]

## IV. CONCLUSION.

For the reasons stated above, Matau's motion to suppress is denied.

IT IS SO ORDERED.

---

1. Whenever, in the above findings of fact and conclusions of law, this court has mistakenly designated as conclusions of law what are really findings of fact, and vice versa, the court's statements shall have the effect they would have had if properly designated. In addition, whenever this written order differs from the court's oral summary of its ruling, this written order governs.